IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 4:07CV3264 |
| ex rel. PHILLIP COX, | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM** |
| v. | ) | **AND ORDER** |
| | ) | |
| GENERAL DYNAMICS | ) | |
| ARMAMENT AND TECHNICAL | ) | |
| PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Phillip Cox ("Cox"), as a *qui tam* relator suing on behalf of the United States,[1] alleges that General Dynamics Armament and Technical Products, Inc. ("GDATP"), violated the False Claims Act ("FCA"), 31 U.S.C. § 3729(a), by supplying the government with defective parts and equipment.  GDATP has moved to dismiss the action pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and, if the motion is granted, requests an award of attorney fees as authorized by 31 U.S.C. § 3730(d)(4).  The motion to dismiss will be granted, but the request for attorney fees will be denied.

## I.  BACKGROUND

This action was commenced on November 26, 2007, when Cox filed a sealed "amended complaint" against GDATP and four of its affiliated companies, General

---

[1]A  *qui tam* action is one in which a private plaintiff sues on behalf of the government under a statute that awards part of any penalty recovered to the plaintiff and the remainder to the government.  *Hays v. Hoffman*, 325 F.3d 982, 986 n. 1 (8th Cir. 2003).

Dynamics Advanced Information Systems, Inc., General Dynamics Aerospace, Inc., General Dynamics Combat Systems, Inc., and General Dynamics Marine Systems, Inc.[2]  On June 15, 2009, after the United States filed notice that it was declining to intervene, *see* 31 U.S.C. § 3730(b)(4), the court file was unsealed and Cox was directed to serve the defendants.  Cox subsequently moved to dismiss all defendants except GDATP, and the motion was granted.  GDATP then filed a motion to dismiss, which Cox resisted only as to the FCA claim.[3]

In a memorandum and order entered on January 6, 2010, I denied the motion to dismiss insofar as GDATP asserted that subject matter jurisdiction was lacking,[4] but granted the motion for Cox's failure to allege with particularity the circumstances of GDATP's alleged submission of false or fraudulent claims to the government for payment or approval.  Because Cox's opposing brief included a request for leave to amend in the event the motion to dismiss was granted, I directed him "to file an amended complaint that fully satisfies the pleading requirements of Rule 9(b) by January 29, 2010."  (Filing 47, p.18)  A "second amended complaint" was filed on February 2, 2010, followed by a "third amended complaint" on February 12, 2010, and a "fourth amended complaint" on February 24, 2010.  The pending motion to dismiss is directed at the final pleading.

---

[2] This initial pleading was erroneously designated as an "amended complaint," presumably because it was patterned after an amended complaint Cox had filed against the same defendants two weeks earlier in another action brought before this court, Case No. 4:07CV3168.  That earlier action was subsequently dismissed without prejudice on Cox's motion.

[3] Cox voluntarily dismissed two other claims in which he alleged violations of the Racketeer Influence and Corrupt Organization Act and of state and federal whistleblower statutes.

[4] I found that even though the FCA allegations had been publicly disclosed when Cox filed the amended complaint in Case No. 4:07CV3168, he is alleged to be "an original source of the information." *See* 31 U.S.C. §3730(e)(4)(A).

## II.  DISCUSSION

As summarized recently by the Eighth Circuit, a Rule 12(b)(6) motion is to be analyzed as follows:

Federal Rule of Civil Procedure 8 requires that a complaint present "a short and plain statement of the claim showing that the pleader is entitled to relief." In order to meet this standard, and survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007))*. The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a "sheer possibility." *Id.* It is not, however, a "probability requirement." *Id.* Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly, 550 U.S. at 556, 127 S.Ct. 1955* ( quoting *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974))*.

A complaint states a plausible claim for relief if its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 129 S.Ct. at 1949*. Several principles guide us in determining whether a complaint meets this standard. First, the court must take the plaintiff's factual allegations as true. *Id. at 1949-50*. This tenet does not apply, however, to legal conclusions or "formulaic recitation of the elements of a cause of action"; such allegations may properly be set aside. *Id.* (quoting *Twombly, 550 U.S. at 555, 127 S.Ct. 1955*). In addition, some factual allegations may be so indeterminate that they require "further factual enhancement" in order to state a claim. *Id.* ( quoting *Twombly, 550 U.S. at 557, 127 S.Ct. 1955*); *see also Brooks v. Ross, 578 F.3d 574, 581 (7th Cir.2009)*.

3

Finally, the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible. *See Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 285 (D.C.Cir.2009) (factual allegations should be "viewed in their totality"); *cf. Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ("The inquiry [under the Private Securities Litigation Reform Act] is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). Ultimately, evaluation of a complaint upon a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950.

*Braden v. Wal-Mart Stores, Inc.* 588 F.3d 585, 594 (8th Cir. 2009).

The FCA imposes liability if a defendant (1) "knowingly presents, or causes to be presented, [to a federal official] a false or fraudulent claim for payment or approval," or (2) "knowingly makes . . . a false record or statement to get a false or fraudulent claim paid or approved." *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009) (quoting 31 U.S.C. § 3729(a)(1)-(2)). Grounded in fraud, FCA claims must satisfy Rule 9(b)'s heightened pleading requirement: "[A] party must state with particularity the circumstances constituting fraud or mistake." *Id.* (quoting Fed.R.Civ.P. 9(b)). To meet this standard and enable the defendant to respond "specifically and quickly," a complaint alleging fraud "must identify who, what, where, when, and how." *Id.* (quoting *United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003)). If it alleges a systematic practice of submitting fraudulent claims, the FCA complaint "must provide some representative examples of [the] alleged fraudulent conduct," specifying "the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *Id.* (quoting *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556-57 (8th Cir. 2006)).

4

### A.  Cox's Allegations

Cox "has been a Quality Assurance Specialist working for the United States Federal Government for the last 33 years."  (Fourth amended complaint (filing 57), ¶ 12) "A Quality Assurance Specialist works with and supervises defense contractors and their production of goods for the U.S. Government."  (*Id.*, ¶ 13) "From September 2004 to the present, [Cox] has been stationed in Lincoln, Nebraska.  As the primary part of his duties, Plaintiff was assigned to work as a Quality Assurance Specialist at Defendant GDATP's Lincoln Plant. Specifically, he worked to ensure the quality of goods produced by GDATP including parts for Blackhawk helicopters and other military equipment."  (*Id.*, ¶ 16)

Cox generally alleges that GDATP knowingly "submitted false claims, records, and statements to officials of the United States for the purpose of obtaining payment or approval in connection with a series of contracts and modifications that Defendant GDATP had entered with the United States Government" and "for payment and/or approval of the production and delivery items, products, and services that did not meet the requirements and standards set forth in GDATP's contracts with the United States." [5] (*Id.*, ¶¶ 20, 21)  Cox states that he "has first hand knowledge of intentional, knowing, and blatant fraud and false claims made by General Dynamics ("GD") [6] against the United States Government" and that "[t]hese frauds involve products and parts produced by GD totaling hundreds of millions to billions of dollars as well as falsifying documents and other frauds." (*Id.*, ¶ 22)  Cox identifies seven products that

---

[5] In this regard, Cox references "Federal Acquisition Regulations . . . Section 46.105," which provides, *inter alia*, that "the contractor is responsible for carrying out its obligations under the contract by . . . [t]endering to the Government for acceptance only those supplies or services that conform to contract requirements[.]" 48 C.F.R. § 46.105(a)(2).  (Filing 57, ¶ 28)

[6] Cox also refers to General Dynamics Armament and Technical Products, Inc., as "GD" in his pleading.  (Filing 57, ¶ 5)

he claims were nonconforming: (1) Blackhawk 230-gallon fuel tanks; (2) F18 480-gallon fuel tanks; (3) composite-metal truck armor; (4) Patriot missile (PAC 3); (5) EKV/Star Wars; (6) Trident missile; and (7) Tomahawk missile. As to each of these products, Cox alleges that he "has first hand knowledge that General Dynamics filed false claims and/or committed fraud on the United States Government. Specifically, General Dynamics submitted false claims for payment of non-conforming parts." (*Id.*, ¶ 24.a.i.-vii.,ix.-xiv.; b.ii.,iii.,v.,vi.; c.;d.i.-iii.; e.; g.i.,v.,vi.; h.) Cox also provides these details about the alleged nonconformities:

(1)     Over the course of his time at its Lincoln, Nebraska Plant (the "Plant"), General Dynamics presented [Blackhawk 230-gallon fuel] tanks to Mr. Cox with a minimum of 15 separate problems, which led to at least 15 separate instances of fraud/false claims.[7] GD quality testing and or quality control supervisors and/or employees usually presented the Blackhawk tanks to Mr. Cox. The relevant time period was from September 2004 to July 2006. The purchase price for each tank is $25,855.74. Mr. Cox was presented/sold at least 300 tanks in his two (2) years at the Plant ($7.75million over just those two years) and the plant had been building tanks for many years before that. (*Id.*, ¶ 24.a.)

(a)     GD used un-calibrated shop tools for cutting out material for use on Blackhawk tail fin contracts. These shop tools were found to be out of tolerance. Mr. Cox informed GD's Quality Manager of the improper use of these un-calibrated shop tools, but Mr. Cox continued to find General Dynamics' personnel using un-calibrated shop tools on numerous occasions even after a corrective action request was issued. Mr. Cox discovered that the tail fins were too thick and did not meet tolerances set forth in the government contract specifications. General Dynamics tried to modify its procedure on the fly, which resulted in hundreds of delaminations on the tail fins. GD presented

---

[7] Only 14 alleged problems are detailed in the fourth amended complaint.

tail fins with these delaminations to Mr. Cox between September of 2004 to July of 2006. The tail fins were non-conforming in dimensions with de-laminations and out of round mounting holes. GD presented non-conforming product along with a false claim for payment over and over again, despite the fact that Mr. Cox informed GD's representatives and managers on numerous occasions to no avail. . . . The fin itself costs approximately $1,200 per fin and Mr. Cox was presented over 400 in his two years at the plant (at least $480,000) and these tanks have been in process for upwards of 20 year[s] (another approximately 4000 parts totaling $4.8 million). (*Id.*, ¶ 24.a.i.)

(b)     GD presented Mr. Cox with Tank cradles [that] were not manufactured in accordance with the contract. Carpet called for in the contract was not purchased from the correct source, was not flame retardant, and it was not the correct color. Black, flame retardant carpet was called for in the contract but regular gray carpet was supplied. Additionally, flame retardant sealant was not used on the cradles as per contract requirement. Lastly, the carpet also did not adhere to the cradle body as required. Carpet was improperly glued and came loose from the cradle. Mr. Cox later found out that General Dynamic's personnel purchased the carpet from a carpet store next door by a GD supervisor. . . . The part itself costs approximately $1,500 per part and Mr. Cox was presented over 200 in his two years at the plant (at least $300,000) and these tanks have been in process for upwards of 20 years (2000 more parts totaling approximately $3 million). (*Id.*, ¶ 24.a.ii.)

(c)     Nonconforming harness wraps on electrical harnesses had been submitted for several years by the time Mr. Cox discovered the fraud. They had never been dimensionally checked during receiving inspection. Wraps were cracked and could separate and flake off. This in turn could induce foreign object damage into the fuel system. These

7

harnesses are submerged in fuel inside the tanks. Electrical harnesses were not within the required tolerances. Different harnesses were found to be too long or too short. Harness connectors were found to be loose inside the Blackhawk fuel tanks. Mr. Cox determined that lock tight was not being used. Lock tight was required per the specifications to prevent the connectors from vibrating loose within the tank. It was evident that Locktite was not being used and had not been used for quite some time. (*Id.*, ¶ 24.a.iii.)

(d)    GD refused/failed to properly safety-wire access doors on the Blackhawk fuel tanks. GD would not safety wire the Blackhawk tanks per the specifications. Based on his knowledge of corrupted process that had not changed since the manufacturing of the part had started, his experience as a QAS, and his knowledge, Cox alleges that every Blackhawk tank purchased was likely improperly safety wired prior to Mr. Cox identifying this discrepancy. (*Id.*, ¶ 24.a.iv.)

(e)    Mr. Cox discovered a General Dynamics employee falsified leak test reports. Work travelers[8] were stamped off indicating GD had performed the leak test, when it had not. One employee was confronted about the time he took to perform the leak test. He confirmed that he indeed had not performed the leak test and had stamped off the paperwork. The employee was reprimanded and given time off from work. (*Id.*, ¶ 24.a.v.)

(f)    Many holes were miss-drilled [sic] in the tank shell. The fuel drain hole was a critical dimension and could not be off more than a few degrees in position. General Dynamics

---

[8] Cox explains that "[w]ork travelers are documents that follow all production parts. Each step in the process of producing an item is codified on this document. Once the particular step in the process is completed, the person performing the task signs or stamps off that the work is complete." (Filing 57, p. 10, n. 3)

8

tried to get Mr. Cox to buy off the miss-drilled [sic] fuel drain holes, but Mr. Cox refused the discrepant fuel tanks, so GD eventually submitted a request for waiver. The waiver was rejected by the [sic] Mr. Cox and then by the Army. (*Id.*, ¶ 24.a.vi.)

(g)     GD engineers presented [a] request for a waiver after using improper sealant for sealing valves. Leakage around these valves was a systemic problem. Mr. Cox asked the engineers if they had proofed the procedure prior to requesting the waiver, and they stated that they had not. In other words, they submitted the request for a waiver before they had even attempted the process to see that it would work. Moreover, the data provided with the request was theoretical and not tested. Waivers are costly to process for the government and should not be submitted without empirical knowledge as to whether or not the waiver will correct the problem. (*Id.*, ¶ 24.a.vii.)

(h)     General Dynamics tried to sell Mr. Cox tanks that had de-lamination in the windings. Mr. Cox refused to buy the shells and General Dynamics submitted a waiver. Eventually, the Army did accept a waiver if General Dynamics met certain conditions during the repair of the tanks. General Dynamics violated the waiver and sand blasted the shells to remove the old paint. Sandblasting made de-lamination of the windings worse. (*Id.*, ¶ 24.a.viii.)

(i)     [T]hree NCs were presented to DCMA for acceptance.[9] (NC 11652/11653 & 11654) Wiring harness wrap tubing had cracks in the material and harnesses were dispositioned as UAI (use as is). This was in violation of the ASM-DTL-

_____

[9] "DCMA" is the acronym for the Defense Contract Management Agency, Cox's employer. (See complaint filed in Case No. 4:07CV3168 (filing 1, ¶¶ 6, 42).) "NC" is not defined.

9

23053 workmanship standard. Many of these discrepant harnesses were used internally in Blackhawk 230 [gallon] external fuel Tanks and shipped to the field.  (*Id.*, ¶ 24.a.ix.)

(j)     General Dynamics . . . provid[ed] parts with a Fuel to fuel ohms reading on tank S/N 4640 varied from 5k ohms to 1 Meg ohm. Reading should be less than 100 ohms. A loose jumper cable was determined to be the cause of the high resistance reading. This tank had gone through the General Dynamics quality system and was presented to DCMA as conforming. Moreover, Tank S/N 4613 was improperly safety wired.  (*Id.*, ¶ 24.a.x.)

(k)     General Dynamics . . . submitt[ed] Tank S/N 4668 to DCMA for verification of leak test. Leaks were noted around each harness connector. The Blackhawk tank had gone through the General Dynamics quality system and was presented to DCMA as conforming.  (*Id.*, ¶ 24.a.xi.)

(l)     GD submitted eight Blackhawk tanks to WAWF for DCMA buyoff. Documents had wrong ship to address and wrong DODAAC. This document was also billed against a shipment that had already been shipped. All documents for payment are supposed to be reviewed by the clerk and quality manager before submittal to DCMA. (*Id.*, ¶ 24.a.xii.)

(m)     GD presented NC# 121145 to DCMA for buyback. An obvious leak was noted at the Blackhawk fuel connector. Leakage is not allowed in this area. The tank had gone through General Dynamics' quality system and was presented to DCMA as conforming.  (*Id.*, ¶ 24.a.xiii.)

(n)     GD performed unauthorized repair on a Blackhawk 230 gallon external fuel tank S/N 4724. Events log showed use of filler around the drain and ground jack. MRB was

10

bypassed as well as General Dynamics Quality Control. The repairs had not been brought to the attention of DCMA but were discovered while reviewing paperwork during final inspection. The tank was presented to DCMA as conforming and ready for buy off. General Dynamics violated procedure and performed a dangerous repair on the external fuel tank. (*Id.*, ¶ 24.a.xiv.)

(2)   Over the course of his time at General Dynamic's Lincoln, Nebraska plant, General Dynamics presented [F18 480-gallon fuel] tanks to Mr. Cox with a minimum of 7 separate problems, which led to several separate instances of fraud/false claims.[10] F18 Tanks were usually presented to Mr. Cox by a General Dynamics engineer and a Quality Control person. Time period was from Sept 2004 to July 2006. The purchase price for each tank is $80,000. Mr. Cox was presented/sold at least 300 in his two years and the plant ($24 million over just those two years) and the plant had been building tanks for many years before that.

    (a)   Mr. Cox discovered Alodine left on internal parts of F18 fuel tank and not properly removed from parts. Alodine when applied to aluminum parts sets up a protective barrier. If it is not properly applied and removed it will corrode the internal parts, so Mr. Cox requested that General Dynamics perform a test to indicate if excessive Alodine was on the internal parts of an F18 fuel tank. The test indicated that the Alodine had not been removed properly and that there was excessive Alodine on the internal parts. The mechanics at General Dynamics were in violation of the Lincoln Process Specification. These tanks were presented to Mr. Cox as conforming. It is evident that excessive Alodine on internal tank parts was not being checked since the beginning of the manufacturing of the parts. Therefore, hundreds to thousands of non-conforming tanks were submitted and signed for as conforming over a

---

[10] Only 6 alleged problems are detailed in the fourth amended complaint.

number of years and shipped to the U.S. Navy. (*Id.*, ¶ 24.b.i.)

(b)    Mr. Cox discovered damaged mounting bolts on the F18 fuel tanks. These bolts are used to attach the external fuel tanks to the wings of the F18 Fighter. Many of the mounting bolts had to be replaced. These tanks were presented to Mr. Cox as conforming and ready for buy off. (*Id.*, ¶ 24.b.ii.)

(c)    Mr. Cox discovered cracking between pins in the harness connectors of the F18 fuel tank. This was in violation of harness manufacturing specification. The rubber seal, which surrounds the harness pins, could short out when the rubber between the pins is cracked. These were almost surely never checked in the history of the delegation resulting in hundreds to thousands of bad parts in use. (*Id.*, ¶ 24.b.iii.)

(d)    [A] work traveler was stamped-off by a General Dynamics supervisor. The supervisor used the clock number of another employee indicating that the employee had completed the task on the F18 fuel tank. Mr. Cox asked the employee if he had stamped off the work traveler and performed the task. The employee stated that he had not stamped off the paperwork and had not performed the work. (*Id.*, ¶ 24.b.iv.)

(e)    F18 Aluminum Identification tags were improperly applied/sealed inside the fuel tank. This could have resulted in the aluminum tags de-bonding from the surface interior of the tank resulting in foreign object damage inside the tank. These tanks were presented to Mr. Cox as conforming and ready for buy off. (*Id.*, ¶ 24.b.v.)

(f)    A check of access door bolt depth revealed that bolts were set at an improper height and that the bolts were not within

12

tolerance. These tanks were present to me as conforming and ready for buy off. (*Id.*, ¶ 24.b.vi.)

(3)     General Dynamics had a delegation to produce truck armor for the Nebraska Army National Guard. The armor delegation required all welds to be verified by a third party welding inspector. The first lot submitted to Mr. Cox did not have the third party certified weld inspection records and there were problems with the welds, so he rejected the welds because of slag, blow holes, cracks in material, improper length of weld runs, poor penetration, no calibrated tools in production area, etc. (*Id.*, ¶ 24.c.)

(4)     Patriot Missile (PAC 3)

(a)     GD presented Patriot missile tubes to Mr. Cox over a period of time from September 2004 to July 2006. Either a General Dynamics Engineer or a Quality Control Person usually were the persons who brought the paperwork to Mr. Cox indicating the PAC 3 cases were ready for buy off. By using a volt ohmmeter to measure resistance on the cases, Mr. Cox discovered that PAC 3 cases were not properly grounded. Moreover, the resistance readings were not within tolerance (excessive – greater than >100 ohms). Resistance readings must be less than < 100 ohms. (*Id.*, ¶ 24.d.i.)

(b)     Patriot missile tubes had gone through General Dynamics' quality system and presented to DCMA as conforming – they were not conforming because: (1) Aft insulator mu repair cracked at 180 degrees and the initial repair had to be repaired again; and (2) Sequence 22.4 "LFR 0652 end of mix time" information space left blank (this matters because it is impossible to verify end of mix time once paperwork has left the production area). (*Id.*, ¶ 24.d.ii.)

13

(c)     Numerous nut plate ears have been damaged during crimping of the rivet. According to I.A.W. LPS 84056 para. 6.3, this is an unacceptable condition. Patriot missile tube had gone through General Dynamics' quality system and presented to DCMA as conforming. Even after DCMA rejection, General Dynamics dispositioned the parts as no defect. (*Id.*, ¶ 24.d.iii.)

(5)     GD used expired products and materials in [EKV/Star Wars] construction. Mr. Cox issued a corrective action request because of expired shelf life material. The Magnetic Particle technician rejected an EKV unit because it did not meet specifications. Mr. Cox learned that a GD supervisor tried to force the technician to sign off on the unit as conforming. The technician refused to falsify the paperwork and verified this story to Mr. Cox. (*Id.*, ¶ 24.e.)

(6)     Tomahawk Missile

(a)     An S/N 20002 Tomahawk missile launch tube failed High Pressure Test. Pressure was stabilized at 186 psi. Pressure at end of ten minutes was approximately 184.75. Loss of pressure is unacceptable. The tube had gone through the General Dynamics quality system and was presented to DCMA as conforming. (*Id.*, ¶ 24.g.i.)

(b)     DCMA was notified to verify Low Pressure Test on Tomahawk Missile Tube case. The calibrated gauge would not zero for Low Pressure Test. The Tomahawk tube had gone through General Dynamics' quality system and was presented to DCMA as conforming. (*Id.*, ¶ 24.g.ii.)

(c)     CCLS (Tomahawk Launch Tube) Case number 20014 was presented to DCMA for buy off. Once pressurized to 185 psi, a leak was noted. The tube had gone through General Dynamics' quality system and was presented to DCMA as conforming. (*Id.*, ¶ 24.g.iii.)

14

(d)     [D]uring final inspection on S/N 20010 Tomahawk Missile Launch Tube a wrenching stud was discovered to be out of tolerance. Free Length dimension required 4.35 + or - .03. One stud measured 4.393. 100% re-inspection of studs on S/N 20010 & 20014 is required prior to submittal to DCMA again. Checking this part was a new delegation for DCMA[11] and the studs had not been checked for several years. It can therefore be assumed that discrepant studs were mounted in numerous Tomahawk Launch Tubes over the past several years when there was not a requirement for government inspection. (*Id.*, ¶ 24.g.iv.)

(e)     CCLS (Tomahawk Missile Launch Tube) S/N 20019 was written up by DCMA for out of tolerance stud length. General Dynamics inspected additional studs on the case and discovered another stud length out of tolerance. Both studs were removed from CCLS case and reinstalled without procedures. DCMA inspected the reinstalled studs and discovered that they were more out of tolerance than the previous day. One stud length measured 4.465 and another 4.435. Maximum allowable tolerance is 4.380. An additional problem noted was mechanics used a pair of calipers which had resin on the slide which makes accurate measurement impossible. Mr. Cox informed the mechanics on 6/20/2006 that the calipers needed to be discarded or repaired. They continued to use the calipers in spite of inaccurate measurements. Since this was a new delegation for DCMA, studs had not been checked for a number of years. Therefore hundreds to thousands of that discrepant Tomahawk Missile Launch Tubes were sent to the field. (*Id.*, ¶ 24.g.v.)

---

[11] Cox alleges that the new delegation "did not mean that the parts did not have to conform prior to the delegation, merely that DCMA was now double-checking that the parts conformed. According to the regulations and contracts, GD knew that the part had to conform prior to the delegation." (Filing 57, p. 23, n. 5)

(f)     Several wrenching studs were checked with 9/16-12 UNC 2A "GO" and "NO GO" gauges. "NO GO" gauge would "GO". Worst case noted was 5.25 turns which was completely through the gauge. This was a new delegation for DCMA. When first asked to buy off these launch tubes, Mr. Cox requested the correct gauges for inspection. General Dynamics did not have gauges to check the threads on the wrenching studs. They ordered gauges and Mr. Cox was able to perform the inspection several days later. The results was that most of the stock in house was out of tolerance. General Dynamics had been shipping these Tomahawk Missile Launch Tubes from their facility for several years before government oversight was imposed. Therefore hundreds to thousands of discrepant Tomahawk Launch Tubes were shipped from GD's facility because they did not have the proper gauges to check the studs.(*Id.*, ¶ 24.g.vi.)

(7)     Mandatory Government inspection is required on D5 (Trident Missile Case) forward and aft fittings. A total of 10 forward and 14 aft fittings were checked for dimensional on the Coordinate Measuring Machine (CMM). Two aft fittings were out of tolerance and three forward fittings were out of tolerance. These had been received from a vendor and accepted into the General Dynamics Supply System. General Dynamics was then required to verify dimensional on these fitting because DCMA has a delegation. This delegation was new, and therefore hundreds to thousands of thousands of discrepant Trident Missile cases were sent to the field. (*Id.*, ¶ 24.h.)

In addition to the alleged problems with the foregoing products and parts, Cox claims that paperwork for certain laboratory testing was falsified:

Shelf life had expired on a resin. A General Dynamics Lab Technician was tasked to re-test the resin for reuse if possible. The technician did retest the resin and it failed to meet specific requirements. Despite the fact that the resin was non-conforming, the GD technician stamped the

16

paperwork saying the resin was usable. This paperwork was sent to Mr. Cox for signature, but he refused to sign-off on the retest as the figures did not meet the requirements. Mr. Cox then asked to watch the retesting of the resin. The technician was unable to perform the test because he did not have the right equipment available and or it was not working right. Test results were even worse than the original reading on the paperwork presented to Mr. Cox for signature. Many weeks later GD called Mr. Cox to the lab for another test of the resin. The resin did not pass retest and could not be used. It was then he learned that it was common practice to round up numbers on tests when the results did not quite meet the standard. This was willful falsification of paperwork to use out of date resin. (*Id.*, ¶ 24.f.)

Finally, it is alleged that "[o]n or about July of 2006, after witnessing almost two years of systemic dysfunction, fraud, false claims, and/or corruption, Mr. Cox sought to have a Level 3 CAR issue[d] to General Dynamics. A Level 3 CAR is a decision whereby the government informs the contractor that the government will no longer accept product from the contractor because of systemic, continuous problems with product presented. In fact, at the time Mr. Cox requested the Level 3 CAR, he had reason to believe that not a single part or piece of equipment that was produced or assembled at the GD plant in Lincoln, Nebraska, confirmed [sic] with the specifications of the government contract." (*Id.*, ¶ 24.i.)

### B. GDATP's Motion to Dismiss

"A prima facie case under [31 U.S.C. § 3729(a)(1)] requires that (1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767 (8th Cir. 2002). "In order to prove a claim under § 3729(a)(2), a plaintiff must also show that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." *United States ex rel.*

17

*Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004). "A claim under § 3729(a)(2) requires proof 'that the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim.'" *Roop*, 559 F.3d at 822 n.3 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 128 S.Ct. 2123, 2126 (2008)).

GDATP contends Cox has failed to allege with particularity the presentment of any claim to the government concerning the allegedly defective products and parts.[12]  I agree that Cox's pleading of this element is insufficient.

The FCA "attaches liability, not to the underlying fraudulent activity, but to the 'claim for payment.'" *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998) (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir.1996)).  "Essentially, then, only those actions by the claimant which have the purpose and effect of causing the United States to pay out money it is not obligated to pay, or those actions which intentionally deprive the United States of money it is lawfully due, are properly considered 'claims' within the meaning of the FCA." *Id.*

It is not enough for Cox to describe manufacturing defects that he discovered while inspecting various products and parts.  To comply with Rule 9(b), Cox must

---

[12] GDATP also contends Cox has failed to allege with particularity that a false claim was *knowingly* submitted, but Rule 9(b) does not require a complaint to state facts establishing the defendant's knowledge.  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).  *But see Wood ex. rel. United States v. Applied Research Assocs., Inc.*, 328 Fed.Appx. 744, 747, 2009 WL 2143829 (2d Cir. 2009) ("[W]e have repeatedly required plaintiffs to plead the factual basis which give rise to a strong inference of fraudulent intent. Essentially, while Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.") (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991)).

18

provide details showing that claims for payment were actually made with respect to the allegedly defective products and parts. *See, e.g., Joshi*, 441 F.3d at 556-58 (complaint filed by doctor alleging that hospital committed Medicare fraud was properly dismissed because conclusory allegations, which failed to identify who submitted the claims to the government, what the content was of the claims and what payment was received, when the claims were submitted, and how the plaintiff learned of the alleged fraudulent claims and their submission for payment, lacked sufficient "indicia of reliability"). Although Cox repeatedly alleges that "General Dynamics submitted false claims for payment of nonconforming parts," and explains why he determined certain types of parts were nonconforming, he fails to provide any information whatsoever about the alleged claim submissions. Simply stated, Cox's allegations fail to demonstrate that he has knowledge the government was actually billed for a product that failed to pass his inspection. "Underlying improper practices alone are insufficient to state a claim under the False Claims Act absent allegations that a specific fraudulent claim was in fact submitted to the government." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).[13] *See also United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) ("Rule 9(b)'s directive that 'the circumstances constituting fraud or mistake shall be stated with particularity' does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government."). Accordingly, the fourth amended complaint will be dismissed.[14]

---

[13] *Corsello* was cited with approval and discussed by the Eighth Circuit in *Joshi*, 441 F.3d at 556-57.

[14] GDATP's motion requests that the dismissal be "with prejudice as to Relator" but "without prejudice as to the Government" (filing 58), thereby "allowing the Government to refile the action in the future if it so chooses." (Filing 59, p. 20) It will be so ordered.

Cox concludes his opposing brief with another request that he be allowed to amend, but he has not shown that the pleading deficiencies can be corrected. In the interest of expediency, I previously granted Cox leave to amend even though he had not filed a motion in compliance with Nebraska Civil Rule 15.1(a) ("A party who moves for leave to amend a pleading . . . must file as an attachment to the motion an unsigned copy of the proposed amended pleading that clearly identifies the proposed amendments."), but I decline to do so a second time. *See Misischia v. St. John's Mercy Health Systems*, 457 F.3d 800, 805 (8th Cir. 2006) (district court did not abuse its discretion by denying plaintiff leave to amend where he made no motion and did not explain substance of proposed amendment, but only included one-line request in his brief).

### C. GDATP's Request for Attorney Fees

The FCA provides that "[i]f the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." 31 U.S.C. § 3730(d)(4). The FCA does not define the terms "clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment," but the Act's legislative history suggests that the standard of § 3730(d)(4) is analogous to that used for claims for attorney fees brought under 42 U.S.C. § 1988. *United States ex rel. Grynberg v. Praxair, Inc.,* 389 F.3d 1038, 1056 (10th Cir. 2004); *Pfingston v. Ronan Engineering Co.,* 284 F.3d 999, 1006 n. 4 (9th Cir. 2002); *Mikes v. Straus,* 274 F.3d 687, 705 (2d Cir. 2001). The Eighth Circuit has indicated that a prevailing defendant is entitled to attorney fees under § 1988 "only in very narrow circumstances." *Williams v. City of Carl Junction,* 523 F.3d 841, 843 (8th Cir. 2008).

"'[A] plaintiff should not be assessed his opponent's attorney's fees'" unless the district court "'finds that his claim was frivolous,

20

unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.'" *Hughes v. Rowe*, 449 U.S. 5, 15, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)). Even "[a]llegations that, upon careful examination, prove legally insufficient to require a trial are not, for that reason alone, 'groundless' or 'without foundation' as required by *Christiansburg*." *Id.* at 15-16, 101 S.Ct. 173. Rather, "[s]o long as the plaintiff has 'some basis' for [his] claim, a prevailing defendant may not recover attorneys' fees." *EEOC v. Kenneth Balk & Assocs., Inc.*, 813 F.2d 197, 198 (8th Cir.1987) (quoting *Obin v. Dist. No. 9 of the Int'l Ass'n of Machinists*, 651 F.2d 574, 587 (8th Cir.1981)).

*Id.*

Cox's fourth amended complaint is being dismissed because it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Braden*, 588 F.3d at 594 (quoting *Iqbal*, 129 S.Ct. at 1949). Although the FCA claim is implausible on its face because Cox has not alleged any facts to establish that GDATP sought payment from the government for defective products and parts, the claim is not clearly frivolous, nor has it been shown that the claim is clearly vexatious or brought primarily for purposes of harassment. GDATP's request for attorney fees therefore will be denied.

### III. CONCLUSION

The fourth amended complaint fails to state a claim upon which relief can be granted under the False Claims Act, but the defendant is not entitled to an award of attorney fees. The court declines to grant the relator leave to amend.

Accordingly,

21

IT IS ORDERED that:

1.      The defendant's motion to dismiss (filing 58) is granted.

2.      Final judgment will be entered by separate document providing that the action is dismissed with prejudice as to the relator but without prejudice as to the United States of America.

3.      The relator's request for leave to amend is denied.

4.      The defendant's request for attorney fees is denied.

May 28, 2010.                          BY THE COURT:

                                       *Richard G. Kopf*
                                       United States District Judge

---

        * This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.